UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| CHARLES LEE THORNTON, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Case No. 4:07CV0079-CDP |
|  | ) |  |
| CITY OF KIRKWOOD, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## DECLARATION OF JAMI L. BOYLES

I, Jami L. Boyles, being first duly sworn on my oath and being competent to testify to the facts set forth herein, do hereby state the following:

1. My name is Jami L. Boyles. I am over the age of 21 and have personal knowledge of the facts stated herein.

2. At all times relevant herein, I have been an associate attorney at the law firm of Lewis, Rice & Fingersh, L.C. ("Lewis Rice").

3. John M. Hessel, a member of Lewis Rice, serves as City Attorney for Defendant City of Kirkwood ("Kirkwood").

4. Mr. Hessel and I, along with the law firm of Lewis Rice, are counsel for Kirkwood in the above-captioned lawsuit.

5. Charles Thornton is the Plaintiff in the above-referenced lawsuit, and is acting *pro se*.

6. Prior to the Rule 16 "meet and confer" conference, as a matter of courtesy, I provided Plaintiff with a draft Proposed Scheduling Order. I hoped this would assist in our discussions about the court-mandated deadlines we were to discuss at the conference.

**A**

1366802.1

7. On or about March 7, 2007, Plaintiff and Defendant's counsel met at the law offices of Lewis Rice for the Rule 16 "meet and confer" conference.[1]

8. Plaintiff brought approximately four pages of handwritten notes,[2] along with several blow-up exhibits for a "presentation" he wanted to give. These appear to be the same blow-up exhibits that he has used for several years at Kirkwood City Council meetings, relating to litigation that was fully adjudicated years ago (including more than 114 charges, resulting in at least 100 convictions, in 2001 and 2002).

9. I intended to conduct the meeting without Mr. Hessel, but, at the beginning of the meeting, it became clear that Mr. Hessel's presence was needed because Plaintiff wanted to address issues and claims unrelated to the claims asserted in this litigation.

10. Although Mr. Hessel and I had both heard much of this "presentation" several times, Plaintiff refused to discuss a single deadline until he finished his presentation. In fact, he insisted on starting the presentation over again after I asked Mr. Hessel to join me.

11. Despite the obvious inability of the Parties to reach settlement, Defendant's counsel listened to the presentation because Plaintiff stated that he absolutely would not discuss deadlines until he had a chance to finish his presentation.

12. The presentation included, among other things, insulting and harsh words about Kirkwood and it's "slave mentality," a blow-up exhibit of a donkey (and discussion regarding Kirkwood's officials' resemblance to that donkey), and blow-up exhibits referencing certain charges and convictions that Plaintiff received from Kirkwood in 2001 and 2002.

---

[1] Initially, I met with Plaintiff, alone because Plaintiff arrived almost 20 minutes prior to the scheduled meeting time. However, Mr. Hessel joined the meeting shortly after it began.

[2] Although there were only three pages, one of those pages contained writing on the backside.

13. Nothing about the presentation assisted in any way in settlement or otherwise clarified any of the claims or defenses that were actually before the Court in Plaintiff's Complaint.

14. During the presentation, Plaintiff stated that he is pursuing redress (perhaps some sort of expungement) for the charges and convictions he received in 2001 and 2002.

15. At the conclusion of this presentation, Plaintiff demanded that Kirkwood give him $15,000,000.00 prior to March 30, 2007, and explained that this amount would increase (in $5,000,000.00 increments) if Kirkwood took certain actions, such as filing anything with the Court or otherwise allowing Lewis Rice to assist in the defense of its client.

16. Plaintiff stated that he would add other parties that are now unnamed if the above-referenced monetary and other demands went unmet.

17. Plaintiff did not mention that there was a typographical error or other unintentional error regarding his failure to name twelve defendants, and any defendants other than Kirkwood.

18. During the Rule 16 conference, after Plaintiff threatened to add certain parties if his demands went unmet, Mr. Hessel and I asked Plaintiff about his reasoning for adding these parties (including ourselves), who had nothing to do with the May 18 or June 15, 2006 arrests, but Plaintiff provided no evidence or reasoning, beyond an explanation, once again, about these charges in 2001 and 2002.

19. Plaintiff did, however, indicate that he did not want Lewis Rice or Mr. Hessel representing Kirkwood because, he alleged, Mr. Hessel had "represented" him in the past and that he had never "released" Mr. Hessel as his attorney. Mr. Hessel informed Mr. Thornton that his assertion was blatantly false and we both explained that Plaintiff has certain duties in filing

3

written pleadings with the court and that he cannot make such false statements to the Court. We further warned him about these same obligations with regard to filing frivolous lawsuits.

20. After the Parties Rule 16 "meet and confer" conference, Plaintiff protested outside the offices of Lewis Rice, with his blown-up exhibits, as I have personally seen him do on other occasions.

21. A true and accurate copy of certain portions of Kirkwood's Charter is attached hereto as Exhibit 1.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct, pursuant to 28 U.S.C. § 1746(1), and if sworn as a witness, I could and would testify confidently thereto.

Executed on this 26th day of March, 2007.

_____
Jami L. Boyles

# CHARTER

of the

# City of Kirkwood, Missouri



Proposed

by the

Kirkwood Charter Commission

for

Submission to the voters

Tuesday, April 5, 1983

Members by ordinance, but no increase in such compensation shall become effective until the commencement of the terms of Council Members elected at the next regular city election held at least six months after the approval of such ordinance and provided that the compensation of any Council Member shall not be increased during the term of office of such Council Member.

(iii) In addition to their compensation, Council Members may receive reimbursement for their actual and necessary expenses incurred in the fulfillment of their office, provided that such expenses are supported by appropriate documentation.

**Section 3.3. Mayor.**

(a) **Eligibility.** Only registered voters of the city shall be eligible to be elected to the office of Mayor.

(b) **Election and term.** The Mayor shall be elected at regular elections of the city for a term of four years.

(c) **Member of council.** The Mayor shall be a voting member of the city council.

(d) **Limitation on terms.** There shall be no limit to the number of times a person may serve as Mayor; provided, however, that no person shall be eligible to be elected to more than two consecutive four-year terms as Mayor.

(e) **Compensation and expenses.**

(i) The first Mayor elected hereunder shall receive as compensation the sum of Three Hundred Dollars ($300.00) per month. This provision shall remain in effect unless otherwise changed by ordinance as provided herein.

(ii) After the first council election hereunder, the council may from time to time determine the compensation of the Mayor by ordinance, but no increase in such compensation shall become effective until the commencement of the term of the Mayor elected at the next regular city election held at least six months after the approval of such ordinance.

(iii) In addition to compensation, the Mayor may receive reimbursement for actual and necessary expenses incurred in the

fulfillment of that office, provided that such expenses are supported by appropriate documentation.

(f) **Additional duties.** In addition to being a member of the city council the Mayor shall:

(i) Preside as chairman of meetings of the city council;

(ii) Call special meetings of the city council as provided by the charter;

(iii) Be deemed the head of city government for legal, ceremonial and military purposes;

(iv) Execute all bills, resolutions, contracts and documents on behalf of the city;

(v) Preside as chairman of the council review of the performance of the Chief Administrative Officer as provided in section 4.1(b);

(vi) Place in nomination for consideration of the city council nominees for the positions of the City Attorney, Municipal Judge, City Clerk and members of all boards, commissions and committees of the city. The council by ordinance may also provide for such nominations to be made by its other members;

(vii) Have the authority to request written reports and opinions from the City Attorney. The council by ordinance or resolution may also provide that written reports or opinions may be requested by its other members, by the council as a whole or by designated city employees;

(viii) Have the authority to request written reports and recommendations from the presiding officer of each board, commission and committee of the city under the jurisdiction of the city council, with the advice and consent of the city council;

(ix) Appoint the Provisional Municipal Judge as provided by the charter.

(g) **Deputy mayor.** The city council shall elect from its members a deputy mayor who shall act as Mayor in the event the office of Mayor becomes vacant or in the event the Mayor shall be unable to perform due to absence or disability.