IN THE CIRCUIT COURT OF THE COUNTY OF ST. LOUIS
STATE OF MISSOURI

==========================================================

CITY OF KIRKWOOD,
          Plaintiff,

Vs.                         Cause Nos. 06CR-4926, 06CR-4927

CHARLES THORNTON,
          Defendant.

==========================================================

TRIAL TRANSCRIPT
February 23, 2007

On February 23, 2007, the above-entitled cause
came on for hearing before the Honorable Ellen Levy Siwak,
Judge of Division 38 of the St. Louis County Circuit Court.

THE HON. ELLEN LEVY SIWAK, Judge

A-P-P-E-A-R-A-N-C-E-S

The City of Kirkwood was represented by Ms.
Brandy Barth, Esq.

The Defendant appeared Pro Se.

Transcribed by Sally Peat, CCR

Exh. A

1

```
1                          T-R-I-A-L

2               This trial began on February 23, 2007, before the
        Hon. Ellen Levy Siwak, Judge of Division 38 of the Circuit Court
3       of St. Louis County, State of Missouri, and without a jury.
        Continuing through and concluding February 23, 2007.  Defendant
4       was present at all in-court proceedings, unless otherwise
        indicated.

5

6                      A-P-P-E-A-R-A-N-C-E-S

7               Brandy Barth appeared on behalf of the City of
        Kirkwood.
8

9               Charles Thornton appeared Pro Se.

10                      ---------------

11              THE COURT:  We're doing both cases.

12      They're different dates.

13              MS. BARTH:  They're different dates.  And

14      we have three witnesses.  So I'm going to take them through

15      the first day and then take them to the second day.  Their

16      facts aren't altogether unsimilar so.

17              THE COURT:  The first date and time of

18      May 8th of '06, but that's the 4927 file, it's actually the

19      second file --

20              MS. BARTH:  May 18th.

21              THE COURT:  Is this May 18th?

22              MS. BARTH:  Um-hum.

23              THE COURT:  It's hard to read on the

24      ticket.  Okay.  So we'll do that date first.

25
```

1    The evidence will show that Mr. Thornton refused to
2    take his seat and Kirkwood Police Officer Ballman
3    intervened.

4    The evidence will show that instead of taking his
5    seat Mr. Thornton laid down in the middle of the chambers
6    in a passive position and refused to stand or get up and
7    take his seat. At this point Officer Ballman asked
8    Mr. Thornton to roll over. He would not comply. And at
9    this point he was arrested.

10   And Mr. Ballman will testify as to the difficulty
11   Mr. Thornton presented in trying to get him out of the
12   chambers in a disruptive behavior that he was exhibiting.

13   Based on this evidence the City of Kirkwood is
14   going to ask that the Judge sentence Mr. Thornton to jail
15   time. That's all I have.

16              THE COURT:  On behalf of the Defendant do
17   you wish to make a brief opening, or reserve your opening?
18              MR. THORNTON:  No, I'd like to make a
19   brief opening, Your Honor.

20              THE COURT:  You may proceed.
21              **DEFENDANT'S OPENING STATEMENT**
22              MR. THORNTON:  Thank you. Good morning.
23   And, Your Honor, you will hear an attempt to violate the
24   rights of free speech. You are also hear the reason of
25   this violation is to avoid dealing with the root of this

10

1    Q.   Okay.  And do you supervise all the departments of
2    the City of kirkwood?

3    A.   All but the law department.

4    Q.   Okay.  And do you also attend all the city council
5    meetings?

6    A.   Yes.

7    Q.   Do you have voting power at the city council
8    meetings?

9    A.   No, I do not.

10    Q.   Okay.  How long have you held that position?

11    A.   Slightly over twenty-five years.

12    Q.   Just for the City of Kirkwood?

13    A.   Yes.

14    Q.   Okay.  And have you held any other positions, city
15    positions for other cities?

16    A.   Prior to Kirkwood I was Assistant City Manager
17    Finance Director in the City of Webster Groves for seven
18    years.  And then prior to that in various administrative
19    rolls in the City of University City for five years.

20    Q.   Are you familiar with the Defendant Charles
21    Thornton?

22    A.   I am.

23    Q.   Can you explain how you're familiar with him?

24    A.   I met Charles -- I call him Cookie, but Charles
25    when I first came with the city twenty-five years ago.  He

1    was one of the -- a member of the business community, a
2    contractor, and just met him at various functions.

3        Q.   And was he generally friendly to you and the city
4    in general?

5        A.   Oh, yes, he -- in fact, he was -- he was always fun
6    to run into.  Mr. Thornton always had a funny word or a
7    good greeting.

8        Q.   And was he active in the community?

9        A.   Yes, he was.  He was involved effectively in our --
10   our development program and annexation of unincorporated
11   Meacham Park neighborhood and our TIFF projects.  He served
12   on our local housing authority, and I believe some other
13   task forces, or commissions.  I don't recall all the
14   details.

15       Q.   And at some point did Mr. Thornton's attitude
16   toward the city and the council change?

17       A.   It seemed to change, the best of my recollection,
18   about in the year 2000.  There were altercations -- I
19   shouldn't say altercations, there are violation of city
20   codes that previously just hadn't existed, that we had to
21   deal with.

22       Q.   And do you know what -- so you're saying that --
23   was Mr. Thornton cited by Kirkwood officials for violations
24   of ordinances?

25       A.   Yes, he was.

                                14

1    Q.    And do you know generally what those violations
2    arose from?

3    A.    They generally were in the category of zoning
4    violations, parking construction vehicles in residential
5    areas, or areas that aren't approved for parking dump
6    trucks, et cetera; for dumping construction debris in areas
7    that were not permitted for that.  Those types of
8    violations were prevalent.

9         He had a lot of his equipment, dump trucks and
10   tractors and things of that nature find their way into
11   various residential neighborhoods, and neighbors would
12   complain, and we'd ask him to move them, they weren't
13   moved, we'd cite him.

14   Q.    Now, prior to this time do you know why
15   Mr. Thornton was not on the public works radar?  Did he
16   have some other kind of -- did he have a change in his
17   business?

18   A.    Well, I don't know all the details of his business.
19   I do know that up until about 2000 he had a -- was leasing
20   a business facility or building down on South Kirkwood
21   Road.  And he left that and was -- he had a lot of
22   equipment parked behind that building, which was fine,
23   that's the place it should have been.

24        When he left that -- lost that lease for whatever
25   reason, that's when the problem seemed to arise.

15

1    Q.   Okay.  I'm going to show you what's been marked as
2    Kirkwood Exhibit A.
3                    THE COURT:  Does Mr. Thornton have a
4    copy?
5                    MS. BARTH:  Yes.
6                    THE COURT:  Thank you.
7    Q.   (By Ms. Barth)  Can you explain for the Judge what
8    that document is?
9    A.   It's a judgment issued by Judge Crancer entering
10   judgments on appeals by Mr. Thornton on a variety of zoning
11   violations on which he had been found guilty in municipal
12   court.
13                   MS. BARTH:  Your Honor, can I approach?
14                   THE COURT:  Yes.
15                   MS. BARTH:  I think I might have given
16   you the wrong copy (inaudible).
17                   THE COURT:  Yeah.
18                   MS. BARTH:  Sorry.  Sorry, I mixed up the
19   copies.
20   A.   Okay.
21   Q.   (By Ms. Barth)  I'm going the hand you another
22   document that's been marked as Exhibit B.  Can you describe
23   what that is?
24   A.   Yes.  It's a judgment issued by again Judge Crancer
25   for various finding -- finding in the city's favor appeals

16

1    from the circuit or from the city court on various zoning
2    and appears other code violations.
3        Q.   And are these the municipal citations you were
4    referring to earlier that began in 2000?
5        A.   Yes.
6        Q.   Okay.  And do you know as your -- in your job as
7    city administrator if Mr. Thornton has paid the City of
8    Kirkwood any of the fines owed under those judgments?
9        A.   He has not.
10       Q.   And do you know about how much money Mr. Thornton
11   owes the City of Kirkwood?
12       A.   Not exactly.  It's somewhere in excess of
13   $15,000.00.
14       Q.   Okay.
15                 MS. BARTH:   Judge, the City would move to
16   have the Court accept those as exhibits.
17                 THE COURT:   Be received.
18       Q.   (By Ms. Barth)  Do you know if Mr. Thornton has
19   appealed or sued the City of Kirkwood over the past five to
20   seven years?
21       A.   On numerous occasions.  He's appealed, best of my
22   recollection, every adverse ruling that he's received from
23   the municipal court.  He's appealed it to the Circuit Court
24   and then state appellate court.  In some cases it's
25   actually gone to the Missouri Supreme Court, but they

17

1    refused to hear it.

2        Q.   And have you also sued them civilly, that you know
3    of?

4        A.   Sued the City civilly?

5        Q.   Yes, him as the plaintiff.

6        A.   As the plaintiff.  I don't have a recollection of
7    that right now.

8        Q.   Okay.  Do you know if Mr. Thornton has been
9    victorious in any of his lawsuits?

10       A.   No, he has not.

11       Q.   You said earlier that Mr. Thornton is a regular
12   attendee of the city council meetings; correct?

13       A.   Yes, he's there frequently.

14       Q.   How often does the city hold council meetings?

15       A.   They're held on the 1st and 3rd Thursday evening of
16   each month at 7:00 p.m. at city hall on Kirkwood Road.

17       Q.   And how often does Mr. Thornton attend city council
18   meetings?

19       A.   Virtually every meeting, although there'll be
20   periods I suppose perhaps business travel or something he
21   may be gone for a block of time, maybe a month.  But then
22   he begins appearing.  And once he's back he attends every
23   council meeting that's held.

24       Q.   Okay.  And during public council meetings are
25   citizens given the opportunity to make comments?

18

1    A.    Yes, there's actually three scenarios there.  And
2    the first is if there's a public hearing that night like on
3    a rezoning, or some sort of development plan, at that
4    hearing all citizens have an opportunity to make comments
5    about or ask questions about the development.

6            The other opportunity that citizens have is to use
7    three minutes, if they have questions or comments about any
8    legislation that will be on the agenda later in that
9    evening.

10           And then the third opportunity that a resident or
11   anyone has is to make a three-minute statement to the city
12   council on any matter that's germane to municipal
13   government.

14   Q.    And has the city always had a policy or some sort
15   of guidelines concerning citizens' comments during those
16   three times?

17   A.    We've always -- in my twenty-five years we've
18   always had a policy that those comments are limited --
19   limited to three minutes.  And the mayor makes that
20   announcement -- or made that announcement at the beginning
21   of each meeting.

22           Subsequently to avoid any possibility of confusion,
23   we've memorialized those into the document that spells out
24   the process of both public hearing and general comments.
25   And that's made available to the public as they come into

1    the council chamber.

2        Q.   I'm going to show you what's been marked as
3    Kirkwood Exhibit C.

4                 MS. BARTH:   I'm handing the Defendant a
5    copy.

6        Q.   (By Ms. Barth)   Can you explain for the Court what
7    that is?

8        A.   This is the document that was drafted by the city
9    council, formally adopted by the city council.  And on one
10   side it discusses the procedures for public hearings which
11   are slightly different than the procedures for commenting
12   on pending legislation or general comments about city
13   government.

14       Q.   And were those guidelines in effect on May 18th,
15   2006?

16       A.   Yes, they were.

17       Q.   Okay.  Did -- generally speaking how long have
18   those guidelines been written?

19       A.   The guidelines actually have gone through several
20   iterations make sure the wording has been clarified, but it
21   dates back to February, March of 2006.

22       Q.   Okay.

23       A.   But the actual procedure of three minutes and being
24   concise, et cetera, has been an unwritten rule for
25   twenty-five years.

1    Q.   Okay.  Are there -- you mention there were
2    three-minute time limits; correct?

3    A.   That's correct.

4    Q.   And are there also guidelines regarding the use of
5    display materials?

6    A.   Yes, the latest procedures are that the displays,
7    presentations, the comments, are to the city council.  That
8    the display material, if there is such, is displayed on an
9    easel facing the city council, and the microphone is next
10   to it.

11   Q.   Are there any guidelines regarding the use of foul
12   or abusive language?

13   A.   Yes.  The guidelines are very specific.  That
14   individuals making a presentation to the city council
15   should not use foul, abusive language.  Essentially respect
16   the nature of the -- of the government meeting.

17   Q.   And are the citizens warned they will be asked to
18   leave the podium and/or building if the citizens failed to
19   follow these guidelines?

20   A.   Yes.  The mayor will generally give someone one or
21   two warnings before they're asked to take their seat, to
22   make sure they understand the rules.  And then if they
23   continue, they are asked to take their seat.  And then
24   essentially removed if they refuse.

25   Q.   And in the past five to seven years that we've been

21

1    talking about, has Mr. Thornton violated these policies?

2         A.    Virtually at every attendance.

3         Q.    And does he bring objects into the city council

4    meeting?

5         A.    He brings in -- periodically he brings in a video

6    camera and sets it up in the rear of the council chamber

7    and directs it up at the podium.  He also brings in

8    posters.  He's brought in other items such as chunks of

9    asphalt and bales of hay to make one point or another.

10        But the posters are always there, or the -- his

11   most favorite poster, the one he brings most frequently I

12   guess I should say, is one of a donkey or a jackass,

13   depending on your nomenclature.

14        Q.    Okay.  And has he brought -- you say he's brought

15   asphalt, has he brought bananas in, too.

16        A.    He's brought bananas, hay bales, asphalt, and he's

17   brought in a poster of -- and these are all fairly well

18   drawn, pencil drawings on three by five cardboard stock, of

19   the three monkeys sitting on a fence with hear no evil, see

20   no evil, speak no evil; the implication there.

21        Q.    And can you describe for the Court what he accuses

22   the council members of, or do you understand what it is

23   he's accusing the council of when he comes in and makes

24   these comments?

25        A.    Well, he -- he has an issue with our public works

22

1       Q.   Okay.  Mr. Brown, I'm going to turn your attention

2   to the events occurring on May 18th, 2006.  Do you recall

3   those events?

4       A.   Yes, I do.

5       Q.   And was there a council meeting on that date?

6       A.   Yes.

7       Q.   Were there any public hearings held?

8       A.   There were -- yes, there were two public hearings,

9   one dealing with an expansion at Bopp Chapel & Funeral Home

10   in Kirkwood on Manchester.  And the other with a rather

11   sizeable expansion to the St. Agnes Home, which is a senior

12   living building in the City of Kirkwood.

13       Q.   And during the Bopp Chapel presentation was the

14   floor open for citizen comments?

15       A.   Yes, it was.

16       Q.   And did any citizens come forward to speak?

17       A.   Several did, including Mr. Thornton.

18       Q.   And did -- in your memory did Mr. Thornton have any

19   display material?

20       A.   He had -- to the best of my recollection he brought

21   up his picture of the donkey, or jackass as he calls it.

22       Q.   Okay.  And you testified that Mr. Thornton commonly

23   uses images of donkeys at council meetings; correct?

24       A.   Yes.  He virtually always does.  Not virtually, he

25   does.

1      Q.   And do you recall after Mr. Thornton put up his
2  display if he said anything to the council members?

3      A.   Well, he -- I can't remember his exact words.  He
4  generally, as I recall, started out putting his drawing of
5  the jackass on the easel, and then just starts a mantra of
6  saying jackass, jackass, jackass.  And then he berates the
7  council at various times.  I can't recall the just the
8  words he used that evening, but that the council is
9  corrupt.  And for -- I can only assume for not pursuing his
10 allegation of perjury further.

11     Q.   And did Mr. Thornton take his seat after the first
12 public hearing meeting?  You said there were two?

13     A.   No, yes.  No, he didn't.  Somewhere in there
14 towards the end of the Bopp public hearing he continued to
15 go on with his berating of the mayor, and the mayor asked
16 him to take his seat on several occasions.  He didn't do
17 that --

18     Q.   No, Mr. Brown, are you confusing it at all with the
19 St. Agnes and the Bopp Chapel?

20     A.   You know, I could be.  They were back to back.  I
21 don't know if it was --

22     Q.   Okay.

23     A.   -- the end of the Bopp Chapel and the beginning of
24 the St. Agnes, but it was in that -- in that time frame.
25     Q.   Okay.  So at some point the mayor told Mr. Thornton

25

1    to take his seat; is that correct?

2         A.    Um-hum, it was -- that's correct.

3         Q.    And did he take his seat?

4         A.    No, he did not.  He fell to the floor.

5         Q.    All right.  And at this point was there a recess

6    called?

7         A.    Yes, the mayor called a recess.  As a matter of

8    fact asked -- had asked a police officer to escort

9    Mr. Thornton out of the council chamber, because he had not

10   taken his seat.  And that's when he fell to the floor.  And

11   the officer mentioned to the mayor that it might be best to

12   call a recess until he could be dealt with.

13        Q.    And what did you do during the recess?

14        A.    Basically just killed time, stayed out of the

15   police officer's way, and waited to get back to the

16   public's business.

17        Q.    Okay.

18                        MS. BARTH:  That's all the questions I

19   have for this witness, but I reserve the right to recall

20   him.

21                        THE COURT:  Thank you.  Cross?

22                        MR. THORNTON:  Yes, Your Honor, thank

23   you.

24

25

26

1    Q.    How often does the City of Kirkwood hold public
2    council meetings?

3    A.    We typically have public council meetings on the
4    first and third Thursdays of the month.

5    Q.    And what duty do you perform as mayor during those
6    meetings?

7    A.    During the meetings I consider my job as running a
8    public meeting, so that the business of this community can
9    be served.

10    Q.    And do you recall the events that occurred at the
11    May 18th, 2006, council meeting?

12    A.    Yes, I do.

13    Q.    What time was the meeting called to order?

14    A.    7:00 or one or two minutes after 7:00 p.m. in the
15    evening.

16    Q.    And were there any public hearings held?

17    A.    There were two that evening.

18    Q.    And what was the first public hearing, if you
19    remember?

20    A.    The first public hearing was a special-use permit
21    for the proposal to expand the parking lot, along with
22    landscaping, at Bopp Funeral Chapel.

23    Q.    Okay.    And how long has Bopp Chapel been in the
24    community?

25    A.    One of our longest continuous serving services,

1    over one hundred years.

2         Q.   Okay.  And after Bopp Chapel's presentation did you

3    open the floor for citizen comments?

4         A.   Yes.  Typically what we do is we have the

5    petitioner speak, and I ask the council for any preliminary

6    questions, followed by opening session for anyone in the

7    audience.  And then we close it with final comments of the

8    city council.

9         Q.   Okay.  And did any citizens come forward to speak?

10        A.   Yes, Mr. Thornton.

11        Q.   And he's the Defendant today?

12        A.   Yes, he is.

13        Q.   Based on your recollection did Mr. Thornton have

14   any display material with him?

15        A.   Yes, he did.

16        Q.   Okay.  And did he place material facing the council

17   meeting?

18        A.   Yes, it was -- yes.  Yes, he did.

19        Q.   And can you describe the display for the Court?

20        A.   It was a -- I'd say rather large picture of a

21   donkey.

22        Q.   Okay.  And has Mr. Thornton used images of donkeys

23   at council meetings before?

24        A.   He has.

25        Q.   And what if anything did Mr. Thornton say next?

1    A.    He asked for a copy of the Negro version of the
2    procedures.

3    Q.    And how did you respond to Mr. Thornton?

4    A.    I asked him if he had any specific questions for
5    the applicant.

6    Q.    And then what did Mr. Thornton say or do?

7    A.    Mr. Thornton asked the applicant if he was planning
8    on using asphalt paving equipment, and planned on indeed
9    laying asphalt.  And the petitioner replied, yes, he was.

10    Q.    And what did Mr. Thornton respond?

11    A.    He cautioned the applicant to be careful in
12    Kirkwood because of the plantation mentality of Kirkwood,
13    that because of the use of asphalt equipment and the laying
14    of asphalt you can be arrested and fined.

15    Q.    And then what happened?

16    A.    Mr. Thornton slowly removed his donkey sign and sat
17    down, as I recall.

18    Q.    Was there another public hearing on the 18th?

19    A.    The second public hearing was another one of our
20    older service businesses in Kirkwood, the St. Agnes Home in
21    Kirkwood.  And they were plan -- they were petitioning to
22    add to their facility, and also a driveway.

23    Q.    So both the Bopp Chapel and St. Agnes were there
24    trying to conduct business and get something done that
25    night; is that correct?

41

```
 1          A.    I think that's -- I think that's important because
 2     these public hearings are serious matters.    And
 3     petitioner's comment after great expense already with
 4     designs and architectural designs, and so coming to the
 5     council a lot of expense and a lot of professional work has
 6     already been done to get to this point.
 7              And it's -- I call it serious business of people
 8     who want to do business and spend money in Kirkwood to
 9     make, in this case, both cases, their businesses more
10     effective for their -- for their customers.
11              They're both long-time businesses in Kirkwood.
12          Q.    Okay.   And after St. Agnes's presentation did you
13     open the floor for public comments?
14          A.    I did.
15          Q.    And did any citizen come forward to make a comment?
16          A.    Mr. Thornton did.
17          Q.    And what did Mr. Thornton say or do?
18          A.    He mentioned that this community has -- is
19     plantation -- is plantation like, and is -- the government
20     is corrupt, and the mayor -- the council and mayor,
21     particularly the mayor, has jackass-like qualities.
22          Q.    And did you respond to Mr. Thornton?
23          A.    I asked Mr. Thornton to specifically address any
24     questions to the applicant.
25          Q.    Okay.   And then what did Mr. Thornton say or do?
```

1      A.   In effect repeated those points a second time. And
2  that was the points of plantation mentality, corrupt
3  government, and jackass-like qualities, particularly the
4  mayor.

5      Q.   Okay. And then what did you do when he continued
6  on with his antics?

7      A.   For the third time I asked him for any specific
8  questions that he had for the applicant.

9      Q.   Okay.

10     A.   And the responses were similar.

11     Q.   Okay. And at this point --

12     A.   There were no questions directed to the applicant.

13     Q.   Right. And at this point was Mr. Thornton
14  disrupting the council meeting?

15     A.   Yes, indeed he was.

16     Q.   Okay. What did you then do?

17     A.   I motioned to Officer Ballman to step forward
18  because I wanted Mr. Thornton to take a seat. It was
19  obvious that there was disruption, and so I motioned to
20  Officer Ballman to do that.

21     Q.   Okay. And at this point Mr. Thornton was not under
22  arrest, correct?

23     A.   No, he was not.

24     Q.   Okay. Did Officer Ballman approach Mr. Thornton?

25     A.   He did -- he did indeed approach Mr. Thornton.

1     Q.   And then what happened?

2     A.   Mr. Thornton at that point sat down on the floor.

3     Q.   And where did he sit down?

4     A.   Right near the microphone in the middle of the

5     floor.

6     Q.   In the middle of the council chambers?

7     A.   Absolutely in the middle of the council chambers.

8     Q.   Okay.  And did some discourse continue with Officer

9     Ballman and Mr. Thornton afterwards?

10    A.   Yes.  Mr. -- Officer Ballman asked me if I would

11    call a recess.

12    Q.   Okay.

13    A.   And I did that.  And then there was Officer Ballman

14    asking the Defendant to stand -- or to -- or leave the

15    council chambers.

16    Q.   Okay.  And so when you called a recess did you

17    leave the council chambers or did you stay at the --

18    A.   Neither did I leave the council chambers nor anyone

19    on the city council --

20    Q.   Okay.

21    A.   -- leave.

22              MS. BARTH:   That's all the questions I

23    have right now, and reserve the right to recall him in

24    rebuttal.

25              THE COURT:   Cross?

44

1  a person had a question that they did not understand it?

2  A. Well, I -- I -- I'm -- I'm not certain how I should
3  answer that or how to answer it. I'm not sure but -- how
4  to answer that question. I mean, the protocol is here, it
5  was worked on with the city attorney and the staff, and I
6  suppose if there was great confusion on someone's part we
7  would do our best to help out.

8  Q. Are you stating that because it's, you say, common
9  sense, common knowledge, the protocol's exactly the same
10  for public comment as is for public hearing?

11  A. There is a sig -- there is a difference in that
12  under the -- under the public comment, as we have for years
13  in Kirkwood, we have -- we have had a three-minute limit on
14  public comments.

15  But where we have public hearings, we expect anyone
16  to speak directly on the issue either in favor or against,
17  or ask specific questions of the petitioner. That's the
18  big difference.

19  Q. Okay. But you would explain that?

20  A. I suppose I would, yeah.

21  Q. Okay. Now, is there any time limit on the public
22  hearing portion of this, during this session?

23  A. Oh, I see where you're going. There is no -- there
24  is no time limit on asking specific questions to applicants
25  who are serious about doing business in Kirkwood.

48

1     Q.   Okay.  So if a person had an opening statement,
2    would that be opening statement concerning an issue of what
3    you just mentioned of the parking lot or asphalt equipment?
4                    MS. BARTH:  Objection, Your Honor, this
5    line of questioning is irrelevant.
6                    MR. THORNTON:  Well, it's directly with
7    the asphalt statement that he made on the parking lot.
8                    THE COURT:  I'll overrule, you can finish
9    the question.
10                   MR. THORNTON:  Okay.
11    A.   What is the question?
12    Q.   (By Mr. Thornton)  If an individual has been
13   allowed to speak, and they start to ask with the opening
14   statement, a question based on facts that they had to prove
15   the exact situation that the petitioner is requesting; I.e.
16   the parking lot.  If they have an opening statement before
17   they go in directly to the question, would you allow that
18   brief opening statement if it's maybe five or ten seconds?
19    A.   Let me give you an example of that evening.  The
20   first public hearing you asked your question of the
21   applicant about using asphalt laying equipment, and
22   asphalt.  Did you plan to use that on this project.  Fair
23   question.  The answer was yes.
24            And then you responded that Kirkwood with its
25   plantation mentalities, be careful because you could be

49

1    was during May 18 did you, any other city council members,

2    attempt to ban me from speaking at the meeting?

3        A.  No, no.

4        Q.  Okay.  Thank you.  Do you understand why I'm coming

5    to these meetings?

6                MS. BARTH:  Objection, vague and not

7    within his knowledge.

8                THE COURT:  I think it calls for

9    speculation.  I'll sustain the objection.

10       Q.  (By Mr. Thornton)  On May 18, because of two public

11    hearings -- well, first I'd like -- I'm sorry, my Exhibit

12    1.  Question now:  Are you familiar with this document

13    that's my Exhibit 1 presented to you, for you?

14       A.  I recall you handing something to us, I didn't

15    recall reading it.

16       Q.  Okay.  Now, this is the reason for public hearing,

17    public comment sections, is for the city and council to

18    attempt to hear or understand what the individual is

19    speaking of?

20       A.  Well, sure, it's a period of time -- I'll answer it

21    two parts.  It's a period of time under a public hearing to

22    get to the critical points of what the application is

23    about, and allow citizens or anyone else, including the

24    council, to ask questions of the petitioner to understand

25    as much as possible what the application is about.

1        Q.   So if the word jackass, jackass, jackass was used
2    and you -- you would have no issue with it because you
3    have -- it has no other context to be related to?
4        A.   I'm not going to response to that.
5                         MR. THORNTON:   Your Honor.
6                         THE COURT:   I think he answered the
7    question.   I think we need to move along.   I also think it
8    invades the province of this Court, okay?
9            I'm going to make a determination whether or not
10   this is a violation of the statute.
11                        MR. THORNTON:   Okay.
12                        THE COURT:   Based upon the words that
13   were used in the testimony at the conclusion of the trial.
14       Q.   (By Mr. Thornton)  During the public hearing
15   sessions when they -- speakers from the audience is allowed
16   to speak, are they allowed to just ask a question in
17   reference to the issue at hand or are they allowed to make
18   a comment and/or question related to the issue at hand?
19       A.   Typically what we hope for in a public hearing is
20   specific questions.   If there's an added-on comment related
21   to that question, that seems to be okay.   But it's focused
22   on getting to the issues of what the application is about.
23           That's what -- that's what the intent of the public
24   hearing is.   Either by council members or the public in
25   general.

1    Q.   And the issue at hand on May 18th was a parking
2    lot?

3    A.   Which public hearing?

4    Q.   On May 18th, the issue on the parking lot issue
5    where asphalt paving was to be used.

6    A.   Are you talking about Bopp?

7    Q.   Yes.  Was that the one with the parking lot?

8                   THE COURT:  I'm sorry, just to clarify
9    and to move things along.  I'm going to ask you direct, be
10   more specific or rephrase your question actually.

11                  MR. THORNTON:  Okay.

12                  THE COURT:  Both public hearings did have
13   parking lot as part of -- as I understand the prior
14   testimony from this individual, as part of their plans.  So
15   you need to be a little more specific if you're asking
16   about one versus the other.

17   Q.   (By Mr. Thornton)  Then I will stopped from
18   speaking the second public hearing relating to the asphalt
19   equipment, was I allowed to finish my question that was
20   asked before I was stopped and arrested?

21   A.   I asked you three times to direct a question to the
22   applicant, and you never did.

23   Q.   Okay.  Did I ask you during that time, yes, if
24   you'd let me finish my presentation.

25   A.   You asked about finishing a presentation, yes, but

                              61

1   you never got to it.  You just kept repeating three times

2   the issue of plantation mentality, corrupt city council,

3   and jackass-like qualities.

4       Q.   When I make the statement did you stop me or did

5   you allow me to finish my final question?

6       A.   I don't know what finish means in this regard, but

7   I do know that three times I asked you to please ask a

8   specific question.

9       Q.   So my question again:  A statement would be allowed

10  based on the issue if that applicant is called up to speak?

11      A.   I don't understand your question.  All I know is

12  that three times I asked you to specifically address the

13  applicant with a question.

14      Q.   Okay.  But could I have also have made a comment?

15      A.   What we typically do is ask either council members

16  or the general public to specifically ask clarifying

17  questions about an application in a public hearing.

18      Q.   My question again --

19                  MS. BARTH:  Objection, asked and answer.

20                  MR. THORNTON:  The comment -- the comment

21  is different from a question, Your Honor.

22                  THE COURT:  I think it's been asked and

23  answered.

24                  MR. THORNTON:  Okay.

25                  THE COURT:  And I have received into