1    15th, 2006, council meeting?

2        A.   Yes, I do.

3        Q.   What time was the meeting called to order?

4        A.   At 7:00 or one or two minutes past 7:00 p.m. in the

5    evening.

6        Q.   Were there any public hearings held on June 15th,

7    2006?

8        A.   Yes, as I recall there were two.

9        Q.   And were they concluded normally?

10       A.   They were indeed.

11       Q.   Okay.  At some point did you open the floor up for

12   citizen comments?

13       A.   Yes, I did.

14       Q.   And did any citizens come forward to speak?

15       A.   We had several, a few citizens.

16       Q.   Okay.  And was the Defendant Charles Thornton one

17   of the citizens that spoke during the citizen comments

18   portion of the meeting?

19       A.   Yes, he was.

20       Q.   And is Charles Thornton in the courtroom today?

21       A.   Yes, he is.

22       Q.   He's the Defendant; correct?

23       A.   He is the Defendant.

24       Q.   What if anything did Mr. Thornton say after you

25   opened the floor to him?

1     A.   He started his public comment by saying jackass,
2  jackass, jackass.

3     Q.   And how did you respond?

4     A.   I asked him to stop.

5     Q.   And then what did Mr. Thornton say or do?

6     A.   Mr. Thornton, as I recall, spoke of again the
7  plantation mentality, and the -- referred to me as jackass.

8     Q.   And did he have any comments about the use of the
9  term jackass?

10     A.   He asked -- he stated that -- that he was using the
11  word jackass in the biblical sense, and he did as I recall
12  have his sign again.

13     Q.   Okay.

14     A.   Of the donkey.

15     Q.   And then what happened?

16     A.   Then I asked Mr. Thornton if he would, you know,
17  ask any questions or make a comment of what he wanted to
18  speak about that evening.

19     Q.   Did any council members other than yourself ask Mr.
20  Thornton --

21     A.   Yes.

22     Q.   -- to stop?

23     A.   After -- after a few seconds Council Member Carr
24  commented that she objected to his language and use of the
25  language.

1     Q.   And did she say to the Defendant --

2     A.   She said -- she specifically said this type of
3  language offends me.

4     Q.   And how did Mr. Thornton respond to Councilman
5  Carr's request?

6     A.   He said that this corrupt city council offends him.

7     Q.   And then what happened?

8     A.   I -- I believe there was a discussion between he
9  and I, and I was asking him if he could make his
10 statements, and he continued the line of the jackass
11 qualities, and plantation mentality; I recall.

12    Q.   And did anything happen next?

13    A.   At a certain point then when I didn't think -- it
14 was -- it was going anywhere in terms of speaking to any
15 issues relevant to the citizens of the Kirkwood, or the
16 City of Kirkwood, I asked him -- he would have to sit down,
17 take a chair.  And that did not occur so at that point in
18 time I asked Officer Ballman to intercede.

19    Q.   And did Officer Ballman approach Mr. Thornton?

20    A.   I think initially he asked him to take the chair.

21    Q.   Okay.

22    A.   From where Officer Ballman was standing he asked
23 him to take a chair.  One, two or three times.

24    Q.   And what did Mr. Thornton do?

25    A.   He continued the discussion that he had of the

1    plantation mentality.

2        Q.   Okay.  And then what did Mr. Thornton do?

3        A.   Then as I recall as Officer Ballman approached the

4    Defendant, the Defendant sat on the floor next to the

5    microphone.

6        Q.   So then what did you do?

7        A.   I called a recess to the meeting.

8        Q.   And did you stay in the council chambers?

9        A.   Not only myself but as I recall all the other

10   members of the council.

11       Q.   And was Mr. Thornton eventually escorted out of the

12   council chambers --

13       A.   Yes.

14       Q.   -- by Officer Ballman?

15       A.   Yes, because of disorderly conduct.

16       Q.   Okay.

17                    MS. BARTH:  Nothing further.  Reserve the

18   right to recall him in rebuttal.

19                    THE COURT:  Okay.  Cross?

20                    MR. THORNTON:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. THORNTON:

23       Q.   Mr. Swoboda, the words jackass, jackass, jackass in

24   itself offended the city council?

25       A.   I think in its context of trying to do the city's

105

1    business, it did.

2        Q.    Okay.  But no explanation before or after
3    allowed -- well, I'm sorry, there was -- there was no
4    explanation before but no allowed of explanation
5    afterwards, how did you determine that it was not
6    appropriate?

7        A.    Mr. Thornton, you gave an explanation of you wanted
8    to use it in the biblical sense.  And of course Mrs. Carr
9    objected to this language.  There didn't seem -- there
10   didn't seem to be any place this was going to me.

11            I'm obligated to run the meeting for twenty-seven
12   thousand four hundred citizens, and there was no discussion
13   by you or in my opinion an intended discussion of the
14   matters before the city in a general nature or specific
15   nature.

16       Q.    So you made that determination within the three
17   seconds of jackass, jackass, jackass?

18       A.    I made that determination within some period of
19   time.

20       Q.    Was that same presentation given at another city
21   council meeting?

22            MS. BARTH:  Objection, irrelevant, we're
23   supposed to keep it to the date in question.

24            THE COURT:  What presentation, the
25   application?

1    jackass, jackass, jackass and then did you allow me to
2    finish my presentation?

3         A.    Well, if you're asking me if -- if you were to the
4    point of disorderly conduct at another subsequent meeting
5    to June 15th, you were not.

6         Q.    Okay.  So are you saying that I did not say
7    jackass, jackass, jackass?

8         A.    I'm not saying you did not say jackass.

9         Q.    Okay.  You're saying I was not dis -- I was not out
10   of order when I said jackass?

11        A.    That's right.  Nor did I ask you in a subsequent
12   meeting to sit down or call an officer to you.

13        Q.    Okay.  So jackass in itself could or could not be
14   disorderly depended on how you feel at the time?

15        A.    In my judgment on the 15th of June, you were not
16   conducting yourself in terms of an appropriate presentation
17   or discussion or questions.

18             And when I say questions, now, the Court must
19   understand that questions can be asked but we don't have a
20   dialogue on public comment.  I mean, you can present
21   whatever you want.

22        Q.    Sir, my question is again you're not basing it on
23   me saying the word jackass, jackass, jackass?

24             MS. BARTH:  Your Honor, this question's
25   been continually asked and answered.

1    location on that date?

2        A.   City council meeting.

3        Q.   And is that in the City of Kirkwood?

4        A.   Yes.

5        Q.   And was Mr. Thornton at the meeting when the

6    meeting was called to order?

7        A.   Yes.

8        Q.   And do you know where he was seated?

9        A.   I believe he was seated in the front row.

10       Q.   And how did the meeting proceed?

11       A.   The meeting proceeded through two public hearings,

12   with no problems.  And then as matter of protocol they go

13   straight to public comments.

14       Q.   And did the mayor open the floor for citizen

15   comments?

16       A.   Yes.

17       Q.   And did anyone approach for citizen comments?

18       A.   Yes, several people spoke about several different

19   subjects.  And then Mr. Thornton was given the floor.

20       Q.   And what if anything did Mr. Thornton say after the

21   floor was opened to him?

22       A.   He walked up to the -- he walked up to the podium,

23   put his -- he has a sign that he carries with him which is

24   a large picture of a donkey, he put it on the easel facing

25   the -- facing the council, and then began his three minutes

112

1    by saying jackass, jackass, jackass.

2        At which point the mayor took umbrage and began
3    a -- there was about a twenty-five second argument between
4    Mr. Thornton and Mayor Swoboda.

5        Q.    And did anyone else object to the use of the term?

6        A.    Correct.  After about twenty-five seconds of the
7    two of them arguing, Council Member Connie Carr stated --
8    actually stated to Mr. Thornton that she would prefer he
9    not use that term because it offends her.

10       Mr. Thornton's response to that was he -- he is
11   offended that the council is corrupt.  And about thirty
12   seconds more -- for about thirty seconds more he and the
13   mayor had argument between each other, at which point Mayor
14   Swoboda motioned to me to intervene with Mr. Thornton.

15       Q.    And what did you do?

16       A.    At that point I stood up from my chair where I sit
17   on the south wall of the council chambers, probably -- this
18   is just a guess, probably fifteen feet from -- fifteen or
19   twenty feet from where Mr. Thornton was.  I stood up and
20   advised Mr. Thornton to take his seat.  He did not.

21       I said one more time, Mr. Thornton, you need to
22   take your seat.  He did not again.  At which point I
23   approached Mr. Thornton, crossing those twenty feet, and
24   asking him to take his seat a third time, at which point he
25   sat down on the council chambers' floor as he did in the

113

1  previous meeting, or in the meeting -- two meetings prior
2  to that.
3      Q.    And at what point did you decide to arrest him?
4      A.    I explained to Mr. Thornton -- when Mr. Thornton
5  sat down on the floor, I kneeled down next to him and told
6  him one more time that he needed to take his seat.  And
7  when he said -- he did not, he said we were going to have
8  to arrest him and drag him out of the council chambers.
9          I told him that given his course of action that is
10 what we would have to do, he would be placed under arrest
11 for disorderly conduct.
12     Q.    And did you give Mr. Thornton any instructions or
13 say anything else to him?
14     A.    I did.  I -- correct -- let me correct.  When he
15 said that it was -- when I told him that was our only
16 course of action to go ahead and arrest him, he went ahead
17 and rolled over onto his front and put his hands behind his
18 back so that we didn't have a repeat on what happened on
19 May 18th.
20     Q.    And you're referring to you didn't threaten him
21 with pepper spray at this point?
22     A.    I did not this time.
23     Q.    And during this -- during this arrest he complied
24 more fully; is that correct?
25     A.    He complied.  I placed the handcuffs on him.  At

1    this meeting there was another officer present, officer by
2    the name of Dave Reagan. When everything began happening
3    Dave Reagan approached from the rear and assisted me.

4         Once I got handcuffs on Mr. Thornton we sat him
5    in -- we got him up to a seated position and began to stand
6    him up. When -- again when he got to about three quarters
7    of the way up his body went limp, and we pulled him from
8    the council chambers.

9    Q.   And did you accompany him over to the police
10   station?

11   A.   I did. When we got out into the vestibule outside
12   the council chambers he said he was not going to walk for
13   us. I immediately got on the radio and asked for two more
14   officers to assist because we were going to have to carry
15   him across the parking lot.

16        When those two officers arrived, which was anywhere
17   between two to three minutes, Mr. Thornton said that --
18   said at that point that he would walk because I was asking
19   him. He said he would walk this time, but he wouldn't do
20   it again if need be.

21   Q.   And did you issue Mr. Thornton a summons on the
22   evening of June 15th, 2006?

23   A.   That is correct, I did.

24   Q.   Let me hand you what has been marked as Exhibit E,
25   do you recognize that summons?

1    A.   I do recognize that summons as written to Charlie
2    Lee Thornton and then signed by myself.
3                    MS. BARTH:   I ask that the Court receive
4    this into evidence.
5                    THE COURT:   Be received.
6                    MS. BARTH:   And the City has nothing
7    further for this witness and reserve the right to recall
8    him for rebuttal.
9                    THE COURT:   Cross?
10                   MR. THORNTON:   Thank you, Your Honor.
11   Your Honor, I'm not sure if I asked if my Exhibit 1
12   will be admitted, received from the Court.   If not I would
13   like to ask now.
14                   THE COURT:   Yes, we're going to admit all
15   the exhibits in both cases.   It will be admitted in both
16   the first case 06CR-4927 and this case 06CR-4926.
17                   MR. THORNTON:   Thank you.
18                   **CROSS-EXAMINATION**
19   BY MR. THORNTON:
20       Q.   When you asked me to leave, did I make a statement
21   that I wasn't finished speaking and my time wasn't up yet?
22       A.   I do recall you saying that.
23       Q.   Okay.   And how much is the allotted time for
24   comments for at the city council meetings?
25       A.   The allotted time for citizen comments is three

116

1    minutes.

2         Q.   And had my time expired to speak on a open topic

3    during the comment section at the city council meeting, the

4    three minutes?

5         A.   Not that I recall.

6         Q.   Okay.

7                        MR. THORNTON:   No further questions, Your

8    Honor.

9                        THE COURT:   Do you have any further of

10   this witness?

11                       MS. BARTH:   No.   The City rests.

12                       THE COURT:   You may step down.   Is the

13   accused resting?

14                       MS. BARTH:   Your Honor, could I release

15   my witnesses?

16                       THE COURT:   Yes.   City rests?

17                       MS. BARTH:   Yes.

18                       THE COURT:   Defendant's case.

19                   CHARLES THORNTON, having been duly sworn,

20   testified as follows:

21                       THE COURT:   You may proceed.

22                       MR. THORNTON:   Charles E. Thornton, 351

23   Attucks, St. Louis, Missouri, 63122.

24                   On the issue at hand of speaking the words jackass,

25   jackass, jackass, that was once again a opening remark that

1     was not directed at anyone, it was merely the word being

2     stated.

3             Had I had the opportunity to finish my comment, my

4     statement was jackass, jackass, jackass, now this is what

5     city council and the mayor and the media wants the

6     community to believe that's all I'm saying, but what I'm

7     saying is, and then I went into my presentation of the

8     document fraud and perjury that the city has issued me.

9             They're stopping me from speaking and not allowing

10    me to even finish the statement after three seconds of

11    saying jackass, jackass, jackass. Clearly to me prove

12    that -- of the violation of my right to speak.

13           The immediate meeting following when I was arrested

14    I said the exact same words, I said I'm going to attempt to

15    finish my first presentation which I was arrested. So I

16    stated jackass, jackass, jackass, and I said, now, this is

17    what the media and the city administrators and the mayor

18    want you to believe that's all I'm saying. But what I am

19    saying is that then I go into my presentation of the other

20    documents that I showed.

21           Yes, I have them blown up maybe bulletin size, two

22    and a half feet by three feet, to show the document fraud

23    and perjury.

24           But each time I have a agenda in which I follow and

25    each time when I was arrested I was denied that right to

118

# CITY OF KIRKWOOD
# CITY COUNCIL MEETING
## GUIDELINES FOR CITIZEN PARTICIPATION

Welcome to tonight's Kirkwood City Council meeting. Citizens are invited to address the City Council during the <u>Public Comment</u> portion of the agenda or during any <u>Public Hearing</u> that may be presented to the City Council. In an effort to make tonight's meeting efficient and meaningful to all who are present in the audience, the following guidelines apply when addressing the City Council:

## PUBLIC COMMENTS:

1. If you would like to address the City Council on any item other than a matter scheduled for a Public Hearing, please raise your hand when the Mayor asks for citizen comments and the Mayor will recognize you.

2. If you are able, please make your comments from the freestanding microphone at the front of the room. If you are unable to do so, you may address the City Council from your seat; however, please speak loudly so that the City Council can hear you.

3. Provide your name and address at the beginning of your remarks for the formal record of tonight's meeting.

4. A time limit of three minutes is given to anyone wishing to address the City Council.

5. It is the Council's policy to not respond or engage in dialogue with speakers concerning their issues, although the Mayor may direct speakers to the City Clerk or an appropriate City department for help with their issue.

6. Display materials may be used as part of your remarks and shall be displayed on the easel provided by the City located by the freestanding microphone. Display materials must be placed to face the council and not the audience. The time to set up and take down display materials is included in the three-minute time limit.

7. If you have materials that you want distributed to the City Council, please present the materials to the City Clerk who will immediately distribute the material.

8. Speakers must be respectful to the City Council, staff, and others in the audience. Therefore, any speaker who uses foul, abusive or inappropriate language, displays or other support materials will be stopped and will not be allowed to continue with his/her comments. The speaker will be ordered to leave the microphone area and directed to be seated. If the speaker refuses to comply with these directives, the speaker may be ordered to leave the building.

*Public Hearing Guidelines are on the back of this Page → → →*

Ex. C

**PUBLIC HEARINGS:**

If you wish to speak on a matter that is the subject of a Public Hearing before the City Council, the process is as follows:

1. The Mayor identifies the item that is being addressed in the Public Hearing;
2. The City Attorney is asked to enter exhibits into the record;
3. The petitioner is invited to make a presentation regarding the issue being presented to the City Council;
4. The City Council may ask questions of the petitioner regarding the issue;
5. The Mayor invites members of the audience to speak on the issue, either to ask a question, or to speak in favor or against the issue. (Please follow the same protocol as set forth for Public Comment above);
6. The City Council may ask any follow-up questions of the petitioner;
7. The City Council determines if the legislation will be placed under New Business on tonight's agenda for its first reading (bills require two readings for passage); and
8. Some public hearings cover controversial issues. In an effort to foster an atmosphere that recognizes all viewpoints, please be respectful of those speaking on an issue, even if their views differ from your own. Please avoid clapping or booing in response to comments made by others. If you wish to comment on an issue, please make sure to use appropriate language and address the Council, not the audience, during your remarks.